WALKER, In re. See Case No. 4,081.

## Case No. 17,064.

### WALKER et al. v. ADAIR et al.

[1 Bond, 158.] [1]

Circuit Court, S. D. Ohio. Dec. Term, 1857.

#### ATTACHMENT—PREFERENCES.

A failing debtor has an undoubted right to pay any debt which he justly owes, and to secure an indorser against liability, if done in good faith.

[Cited in National Park Bank v. Whitmore, 104 N. Y. 304, 10 N. E. 526.]

[This was an action by Walker & Brothers against Adair & Anderson. Heard on a motion to dismiss an attachment.]

Thompson & Nesmith, for plaintiffs.
Snow & Bradstreet, for defendants.

LEAVITT, District Judge. This is a motion to dismiss the writ of attachment issued in this case, upon which certain goods and merchandise have been seized as the property of the defendants and are now in the possession of the marshal. The allegations of fraud in the affidavit on which the writ issued, are that the defendants have disposed of and assigned their whole property with the intent to defraud their creditors; and also that they are about to remove their property beyond the jurisdiction of this court, with the intent to defraud their creditors. The motion to dismiss is based on a denial of the allegations of fraud, and on this motion a number of affidavits have been presented by the defendants and also counter affidavits by the plaintiffs.

The facts which it is essential to notice are, that for some time prior to the 15th of July last, the defendants had been in business in the city of Cincinnati as a mercantile firm under the name of Adair & Anderson; that on the said 15th of July, the partnership expired by its own limitation and Anderson retired from the firm. The business was continued at the same place under the name of Adair & Brothers, who purchased the interest of Anderson, giving him their note for $3,935, with Charles W. Hunter as indorser. Some time in September last, it appears, the firm of Adair & Brothers became embarrassed, and were apprehensive they could not sustain themselves. An inventory of their stock and assets was taken, from which it appears their goods, at Eastern cost, were valued at about $17,000, and their notes, accounts, etc., at about $21,000, making together $38,000. Their liabilities at the time were estimated at about $35,000. Apprehending they might be pressed by their creditors, and that a sacrifice of their stock would be the

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

result—with the advice of counsel, on the 8th of October, they sold their entire stock of goods, with all their assets, to Hunter, taking his notes therefor, at the estimated value as above stated, payable in two, three, and four years. This arrangement was not carried out, and was soon after entirely abandoned, by the advice of counsel, as objectionable. Immediately after, notice was given that the creditors of the firm would be paid either in goods at Eastern cost, or in notes held by the firm. Many availed themselves of this offer, and prior to the 10th of November, the payments in that way amounted to about $9,000. With two or three exceptions, the creditors were satisfied with this arrangement, and made no objection to it. On the 10th of November the stock of goods had become much reduced by these payments. The firm were then indebted to Charles W. Hunter, on their note, for money borrowed of him to the amount of $1,153, and he was liable for the firm on the notes to Anderson, on which he was indorsed for $3,935. On that day, to secure the debts due to Hunter, and to indemnify him for his liability as indorser on the notes held by Anderson, he purchased of Adair & Brothers the entire stock of goods remaining, at seventy-five cents on the dollar of the Eastern cost. The goods so purchased amounted to $5,681.53, and pursuant to the agreement, Hunter surrendered to Adair & Brothers the note he held on them for $1,153, and assumed the payment of the notes held by Anderson. For the balance due from Hunter on this purchase, being $593, he gave his note to Adair & Brothers, which has been applied in payment of a debt due by them. Hunter immediately took possession of the goods, and continued in business in the same house occupied by Adair & Brothers. On the 21st of November, Adair & Brothers found it necessary, for the interests of those creditors whose claims had not been satisfied, to make an assignment of all their remaining property and effects, and Charles W. Hunter was named as the assignee. This assignment was for the equal benefit of all the unpaid creditors of Adair & Brothers. On the 24th of November the goods were placed in boxes and forwarded by railroad to Piqua, in the state of Ohio. They were intercepted at Dayton, in transitu to Piqua, and seized by the marshal, under the attachment issued in this suit.

The question arising on these facts is: Was there fraud in the sale of the goods to Hunter made on the 10th of November, or in the assignment by Adair & Brothers made on the 21st of November? It is not necessary to decide whether the sale to Hunter of the 8th of October was infected with either actual or presumptive fraud. The evidence, however, is conclusive that, though the arrangement may have been an injudicious one, no fraud was intended by the parties. The affidavit of a respectable legal gentleman proves that it was made at his suggestion and advice, as an arrangement that would be beneficial alike to Adair & Brothers and their creditors. But,

right or wrong, it was abandoned by the parties, and nothing is claimed under it. And in my judgment, all the circumstances considered, there is nothing in this sale to justify an unfavorable presumption as to the subsequent transactions between these parties. In reference to the sale to Hunter, made on the 10th of November, I see nothing in the facts which condemn it as fraudulent, either in fact or in law. Hunter was a bona fide creditor of Adair & Brothers, to the amount of $1,153, for cash loaned to them, and was liable as indorser of their paper for $3,935. It was no fraud in Adair & Brothers to pay the debt due to Hunter and indemnify him for his losses as indorser. A failing debtor has an undoubted right to pay any debt which he justly owes, and to secure a friend against liability, if done in good faith. And I confess I am unable to perceive any indication of unfairness or fraud in this transaction. The evidence is conclusive that the price paid by Hunter for the goods—seventy-five per cent. on their Eastern cost—was their full value, and more than would have been procured for them if sold at auction or at an assignee's sale. As to the fairness and validity of the general assignment to Hunter, made on the 21st of November, there seems no reason to doubt. It was not contemplated when the sale of the 10th of that month was made to Hunter. It appears, however, that after the most earnest efforts for that purpose, the firm had been unable to make a satisfactory arrangement with all the creditors. They had settled with the most of them on terms which the creditors regarded as fair and honorable. They had offered to arrange the claim of the plaintiff on terms as favorable as they could in justice to their other unpaid creditors. The proposition had been declined, and they were threatened with an attachment. It was under the pressure of these circumstances that they made the assignment to Hunter. There is nothing in this assignment which has the taint of fraud. It was made with the advice and under the direction of counsel, having full knowledge of the parties and of the state of their business affairs, with no other purpose than to secure to the creditors of the firm an equal distribution of the proceeds of their remaining property and effects. It is not pretended that the assignment did not cover all the property of the firm, or that a preference was given to one or more creditors. And the proof is clear that there was no concealment or disguise in any of the transactions between the parties. Public notice was given in a widely circulating commercial daily paper of the city, two days after the date of the assignment, which negatives the idea that the transaction was intended to be secret. It is moreover in proof that Adair & Brothers freely conferred with and made known to their friends and creditors the unpleasant embarrassment of their business concerns, and the means they were taking to close their affairs. But it is insisted by the plaintiff's counsel that the assignee selected by them was an unsuitable per-

son for the position, and that his selection raises a presumption against the fairness and honesty of the transaction. Without noticing all the facts in evidence as to the suitableness of Charles W. Hunter, it may be stated that, although a young man, he had gained the confidence of those in whose employment he had been, as well as of many others who knew him for his strict integrity, and stood high in their estimation as a young man of good business capacity. Few young men could establish a better character than he has proved by a number of witnesses, the truthfulness of whose statements is beyond a doubt. He also had pecuniary means, to the amount of between $4,000 and $5,000; and his intimate knowledge of all the business concerns of the firm of Adair & Brothers, in connection with his good reputation, seemed to have rendered it exceedingly proper that he should be intrusted with the settlement of their business as assignee. It is also urged as an indication of fraud in the assignment, that an effort was made to send the goods assigned to Piqua, in this state. This, it is contended, was for the purpose of concealment, and with a view to place the property beyond the jurisdiction of this court. This, however, is satisfactorily explained by the proofs before the court. It had been the intention of the firm, before they contemplated an assignment, to remove the goods to that place for sale. The reason for this was, that they would thereby avoid the high rent they were paying in this city, and find an equally ready and advantageous market for the goods. Hunter concurred in this view, and when the property was placed under his control as assignee, very properly decided to carry it out. There was no concealment in preparing the goods for shipment or in sending them away. The intimation that it was the design of the parties by sending them to Piqua, to place them beyond the jurisdiction of this court, is answered by the fact that they would have been as fully within reach of the process of this court at Piqua as at Cincinnati.

It may not be amiss here to make a remark in reference to the facts stated in Marshal Sifford's affidavit, to the effect that when he went to the former place of business of the firm of Adair & Brothers for the purpose of executing the attachment, one of the firm referring to the goods being removed from Cincinnati, spoke of them as the property of the firm, and not of Hunter. This, it is insisted, authorizes the conclusion that there had been no bona fide sale or assignment to Hunter. I do not question the truthfulness of the marshal's statement, but I can not suppose the conversation to which he testifies sustains the inference attempted to be drawn from it. It is more reasonable to conclude that Mr. Adair, in his supposed admission that the property still belonged to the firm, had reference to the fact that though placed in the hands of an assignee, the firm still had an interest in its management and disposal, and that in some sense it still belonged to them. Any other inference is so utterly in conflict with the proof before the court, that I can not hesitate to adopt that which I have indicated. It is incredible that Adair could have intended to ignore facts which are proved by the most indubitable evidence. But I do not propose to go further in the investigation of the facts involved in this motion. I am satisfied the allegations of fraud are not sustained, and I may be allowed to say that, in my judgment, it is rare that the conduct of business men, in embarrassed or insolvent circumstances, is so free from exception as that of the Adairs would seem to be from the evidence before me. The evidence clearly shows that they were anxious to do all in their power to satisfy their creditors. All their movements were open and evince no intention to conceal anything from their creditors. These creditors, with one or two exceptions, were entirely satisfied with the course they have pursued; the affidavits of a number of them have been taken, and, without an exception, they state there was nothing in the proceedings of Adair & Brothers with which they were dissatisfied. And they not only testify that after years of business intercourse with the firm, they have always found them honest and honorable in their transactions, but that they still have unabated confidence in their fairness and integrity. The motion to dismiss the attachment is sustained, and the property attached is discharged.